## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| IAN S. PHILLIPS<br>58 Otter Cove Drive<br>Old Saybrook, CT 06475<br><br>**Plaintiff**<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER<br>& SMITH INCORPORATED<br>4 World Financial Center<br>New York, NY 10271<br><br>**Defendant** | :<br>:<br>:<br>: **CIVIL ACTION NO.**<br>:<br>:<br>:<br>:<br>: **JURY TRIAL DEMANDED**<br>:<br>:<br>:<br>:<br>:<br>: |

### PARTIES

1.   Claimant, Ian S. Phillips (hereinafter referred to as "Plaintiff") is an adult individual residing at 58 Otter Cove Drive, Old Saybrook, CT 06475.

2.   Respondent Merrill Lynch, Pierce, Fenner & Smith Incorporated (hereinafter referred to as "Merrill Lynch") is a Delaware corporation with a principal place of business located at 4 World Financial Center, New York, NY 10271.

### JURISDICTION/VENUE

3.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) in that both parties are citizens of different states and the amount in controversy exceeds $75,000.00.

4.   Jurisdiction over Merrill Lynch is proper in this Court pursuant to 28 U.S.C. § 1332 (c)(1) in that Merrill Lynch is incorporated in the State of Delaware.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) and (a)(3) in that a substantial part of the property that is subject to this action is situated in the District of Delaware and Merrill Lynch is subject to personal jurisdiction in this judicial district.

## FACTS COMMON TO ALL COUNTS

6. This claim relates to the gross misconduct and reckless mishandling of Plaintiff's investment accounts by Merrill Lynch and its registered representative Sanford Perlin (hereinafter referred to as "Perlin").[1]

7. During their relationship with Plaintiff, Merrill Lynch and Perlin made misrepresentations and material omissions of fact to Plaintiff, failed to implement an appropriate investment strategy, failed to manage Plaintiff's accounts in a manner consistent with Plaintiff's investment objectives, and made unsuitable transactions, which included investing in high-risk hedge funds.

8. By way of background, Plaintiff was the founder and 51% shareholder of The Magellan Group, Inc. (hereinafter referred to as "Magellan").

9. In 1999, Plaintiff and his partner decided to sell Magellan and entered into an agreement and plan of merger (hereinafter referred to as "Merger Agreement") with Cybershop International, Inc., and MG Acquisition Corp., (collectively referred to as "Cybershop"), in which

---

[1] Sanford Perlin is an adult individual who was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch and worked out of a Merrill Lynch office located in New York City. Perlin's acts, conduct and wrongs complained of herein by Plaintiff were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch. Perlin's employment with Merrill Lynch was terminated in May of 2000.

Plaintiff sold his entire interest in Magellan to Cybershop.

10. The bulk of the Cybershop Stock was restricted since it was not registered under the Securities Act of 1933 ("1933 Act").[2] The unregistered shares were also subject to a one-year holding period and the subsequent Rule 144 volume requirements.

11. Prior to closing on the Merger Agreement, Plaintiff determined that he needed a professional investment advisor to manage the proceeds from the sale of his business.

12. Plaintiff had no prior experience in dealing with unregistered shares and never had a significant investment portfolio.

13. Approximately two months prior to closing, a mutual friend introduced and arranged an initial consultation between Plaintiff and Perlin who, at the time, worked out of Merrill Lynch's New York City office on 6th Avenue.

14. During a meeting in May of 1999, Plaintiff told Perlin that he viewed the cash and stock he was going to receive from the sale of his business as his retirement fund and that he was concerned about the restrictions on the Cybershop Stock.

15. Plaintiff specifically asked Perlin if there was anything he could do to protect the unregistered shares in the event the Cybershop stock price declined.

16. Perlin advised Plaintiff that there was no hedging strategy available for unregistered shares and that there was nothing Merrill Lynch could do to liquidate his Cybershop Stock.

---

[2] The Merger Agreement did require Cybershop to commence the registration under the 1933 Act on Form S-3 of approximately 75,000 shares of the Cybershop Stock no later than July 1, 1999.

17. At the meeting, Plaintiff also shared with Perlin his financial objectives, including the fact that he was not interested in speculative investments and would like to diversify his holdings as much as possible.

18. Plaintiff also made clear to Perlin that he had limited investment experience and that he would rely on Perlin and Merrill Lynch's recommendations and professional expertise to manage his portfolio.

19. In response to Plaintiff concerns, Perlin assured Plaintiff that he was capable of managing his assets in a manner consistent with his investment objectives.

20. Moreover, Perlin held himself out as a high net worth individual and represented to Plaintiff that he had significant experience representing large accounts and that he could invest Plaintiff's assets in vehicles which were designed to preserve the proceeds from the sale of his business.

21. Based solely on Perlin and Merrill Lynch's representations and assurances about Plaintiff's investment objectives, Plaintiff entered into a Financial Services Agreement with Perlin and Merrill Lynch and opened an investment account in May of 1999.

22. Pursuant to the terms and conditions of the Financial Services Agreement and Perlin and Merrill Lynch's express representations, Merrill Lynch agreed to, inter alia, recommend investments that were suitable to Plaintiff's objectives, perform due diligence with respect to its investment recommendations, and represent and disclose the risks associated with their recommendations.

23. From that time forward, Plaintiff relied upon Perlin and Merrill Lynch to provide

suitable investment guidance and to make recommendations of investments that were particularly tailored to his needs.

24. On or about June 1, 1999, closing occurred on the Merger Agreement.

25. On June 4, 1999, Plaintiff transferred to his Merrill Lynch account approximately $2,786,300.00, which represented the entire cash proceeds from the Merger Agreement.

26. On June 7, 1999, Plaintiff delivered to Perlin and Merrill Lynch the Cybershop Stock in the form of original stock certificates Nos. CS 0203 and CS 0204, for 433,500 and 76,500 shares, respectively.[3]

27. Shortly thereafter, Plaintiff arranged a meeting with Perlin in his Merrill Lynch office in New York City to discuss how to invest the proceeds from the sale of his business.

28. At the meeting, Perlin specifically told Plaintiff that his goal was to protect Plaintiff in case the market went "south". At this point in time, Plaintiff's Merrill Lynch CMA account had a balance of approximately $3,000,000.00 in cash as well as the unregistered Cybershop stock which had a market value in excess of $5,000,000.00.

29. Plaintiff clearly expressed his concerns about Cybershop's stock price declining and that Perlin should not rely on the value of the stock when making his investment decisions with the cash holdings.

30. Perlin again advised Plaintiff that there was nothing he could do to protect

---

[3] Upon information and belief, stock certificate No. CS203 (433,500 shares) represented the unregistered shares and stock certificate No. CS0204 (76,500 shares) represented the shares that had to be registered no later than July 1, 1999.

Plaintiff's interest in the unregistered Cybershop stock.

31.     Shortly after the meeting in Merrill Lynch's office, Perlin told Plaintiff that he knew of a great investment opportunity for Plaintiff and suggested placing $2,000,000.00 in a limited partnership named Olympus, LLP ("Olympus"), which represented in excess of 66% of Plaintiff's liquid assets.

32.     Plaintiff invested in Olympus at the recommendation of Perlin and on June 29, 1999, Perlin wired $2,000,000.00 from the Merrill Lynch CMA account to the Olympus account.

33.     Over the course of the next several months, Perlin would call Plaintiff on numerous occasions and tell him how well the fund was doing.

34.     On September 30, 1999, Plaintiff received a report from Olympus, which stated that his account had lost $342,000.00.

35.     Plaintiff immediately phoned Perlin who explained that the fund was doing well and that the losses were simply a result of "shifting" market conditions.

36.     In November and December of 1999, Plaintiff again received phone calls from Perlin stating that things were going "great" with the Olympus investment.[4]

37.     In February of 2000, during a dinner to which he and his wife were invited by Perlin, Plaintiff inquired as to why he had not received a year-end statement that reflected his Olympus investment.

---

[4] During this time, a portion of Plaintiff's Cybershop stock was registered pursuant to the Merger Agreement and Plaintiff instructed Perlin to liquidate approximately 40,000 shares of his Cybershop stock held in his Merrill Lynch account.

38. Perlin advised Plaintiff that he should have a "draft" of the report shortly and gave Plaintiff a piece of paper titled "Olympus Domestic Return Date Since 6/30/99", which showed a cumulative return of 22% for Plaintiff's investment since June 1999.

39. However, in March of 2000, Plaintiff received a K-1 from the Olympus accountant which reflected that Plaintiff's investment was valued at $1,440,846.00 and that Plaintiff's investment accounted for 22% of the partnership.

40. Plaintiff immediately contacted Perlin at Merrill Lynch to inquire about the K-1 and asked how it was possible that he lost money since Perlin had told him that Plaintiff's investment had a cumulative rate of return of 22%.

41. Perlin stated that Plaintiff could not have lost in excess of $500,000.00 and that there must have been an "accounting" error.

42. Shortly thereafter, Perlin provided Plaintiff with a quarterly report evidencing that the fund was up substantially for the quarter.

43. Plaintiff continued to receive telephone calls from Perlin during which he touted Olympus' performance and Merrill Lynch's ability to manage high net worth individuals.

44. In March of 2000, Perlin advised Plaintiff that he knew of another great investment opportunity and instructed Plaintiff to invest $500,000.00 in a commodities fund.

45. Trusting Perlin's and Merrill Lynch's judgment, Plaintiff agreed to the investment in the fund and Perlin wired $500,000.00 from Plaintiff's Merrill Lynch CMA account to a commodities fund run by John Henry & Company, Inc. ("John Henry").

46. Once again, Perlin and Merrill Lynch provided little information to Plaintiff about

the investment and failed to disclose the inherent risks associated with commodities funds.

47. On May 10, 2000, Perlin informed Plaintiff that he had left Merrill Lynch and was now working for a new brokerage firm named Round Hill Securities, Inc.

48. By August of 2000, Plaintiff's John Henry investment had declined approximately $125,000.00 and was valued at $375,000.00.

49. However, Plaintiff was still under the impression that the Olympus fund was prospering due to Perlin's express representations.

50. Over the course of the next year, Plaintiff's unregistered Cybershop Stock, which was originally valued in excess of Five Million ($5,000,000.00) Dollars, became virtually worthless when Cybershop's stock plummeted during the time period the shares were restricted.

51. In August of 2001, Plaintiff liquidated 90% of his Olympus holdings at an approximate loss of $800,000.00.

52. Under Merrill Lynch's management, Plaintiff's sustained losses in excess of $6,000,000.00.

## COUNT I

### BREACH OF CONTRACT UNDER NEW YORK LAW

53. Plaintiff incorporates by reference Paragraphs 1 through 52 above as if the same were set forth fully herein.

54. Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch. Perlin's acts, conduct and wrongs complained of herein by Plaintiff were carried out within the course and scope of Perlin's employment with the express,

apparent and/or implied authority of Merrill Lynch.

55. As set forth above, Merrill Lynch and Plaintiff entered into a Financial Services Agreement pursuant to which Merrill Lynch promised to provide to Plaintiff comprehensive financial services and professional asset management and financial advice.

56. Pursuant to the Financial Services Agreement and Merrill Lynch's express representations, Merrill Lynch agreed to invest Plaintiff's funds prudently in accordance with his explicit investment objectives.

57. Merrill Lynch breached the Financial Services Agreement with Plaintiff by, inter alia, failing to recommend conservative, safe and suitable investments in light of Plaintiff's explicit investment objectives and employment status, failing to perform the requisite due diligence with regard to their investment decisions, and making misrepresentations and omissions regarding the status of Plaintiff's account.

58. In fact, once they gained control of Plaintiff's assets, Merrill Lynch and Perlin engaged in a radical course of conduct, which included investing a staggering $2,000,000.00 in Olympus, a start-up hedge fund with virtually no investment history.

59. Moreover, even after sustaining heavy losses in Olympus, Perlin and Merrill Lynch invested another $500,000.00 in John Henry, which did nothing to diversify Plaintiff's holdings.

60. In addition to investing in patently unsuitable investment vehicles, Merrill Lynch and Perlin also provided wholly inaccurate information with regard to Plaintiff's

unregistered Cybershop stock.

61. In fact, Merrill Lynch failed to advise Plaintiff of basic hedging options available to diversify the unregistered shares of Cybershop stock in accordance with Plaintiff's clearly stated investment objectives.

62. Precisely, Merrill Lynch and Perlin failed to advise Plaintiff that prepaid variable forwards (hereinafter referred to as "PPVF") collars and private sales all could have been utilized to protect his position in the event that the Cybershop stock value declined.[5]

63. Based on Merrill Lynch's and Perlin's negligent advice, Plaintiff lost the opportunity to hedge his unregistered Cybershop stock, which at one point was valued at over $5,000,000.00, but which was ultimately rendered worthless.

64. Merrill Lynch's and Perlin's behavior was completely inappropriate and in breach of the Financial Services Agreement considering Plaintiff's very specific investment objectives and Plaintiff's desire to diversify his assets, and in breach of the Financial Services Agreement.

65. Merrill Lynch's and Perlin's investment strategy together with the representations made to Plaintiff, were wholly incompatible with the terms of the Financial Services Agreement and clearly contrary to Perlin's and Merrill Lynch's express guarantees and assurances which induced Plaintiff to invest his entire life savings with Merrill Lynch in the first place.

---

[5] Both PPVF and Private Sales allow individuals who own unregistered shares, which are subject to a one-year holding period and the Rule 144 requirements, to reduce their exposure and achieve diversification. Had Merrill Lynch and Perlin advised Plaintiff that a hedging strategy was available, Plaintiff would have diversified his holdings and would not have been exposed to the degree of risk that he was. However, Plaintff did nothing based upon Perlin's and Merrill Lynch's advice and Plaintiff's unregistered shares of the Cybershop stock became virtually worthless when the stock price crashed during the time period the shares were restricted.

66. Although the purchase of non-diversified high risk hedge funds should have raised a red flag given Plaintiff's investment objectives, at no time did anyone at Merrill Lynch contact Plaintiff to confirm his investments objectives or to inquire why large sums of money were being wired out of his account.

67. Merrill Lynch's and Perlin's investment strategy and recommendations left very little of Plaintiff's assets in secure investment vehicles.

68. As a direct and proximate result of Merrill Lynch's and Perlin's breach of contract, Plaintiff has sustained actual out of pocket losses in Olympus of over $6,000,000.00.

## COUNT II

### BREACH OF CONTRACT UNDER CONNECTICUT LAW

69. Plaintiff incorporates by reference Paragraphs 1 through 68 above as if the same were set forth fully herein.

70. Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch. Perlin's acts, conduct and wrongs complained of herein by Plaintiff were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch.

71. As set forth above, Merrill Lynch and Plaintiff entered into a Financial Services Agreement pursuant to which Merrill Lynch promised to provide to Plaintiff comprehensive financial services and professional asset management and financial advice.

72. Pursuant to the Financial Services Agreement, Merrill Lynch agreed to invest Plaintiff's funds prudently in accordance with his explicit investment objectives.

73. Merrill Lynch breached the Financial Services Agreement with Plaintiff by, inter alia, failing to recommend conservative, safe and suitable investments in light of Plaintiff's explicit investment objectives and employment status, failing to perform the requisite due diligence with regard to their investment decisions, and making misrepresentations and omissions regarding the status of Plaintiff's account.

74. In fact, once they gained control of Plaintiff's assets, Merrill Lynch and Perlin engaged in a radical course of conduct, which included investing a staggering $2,000,000.00 in Olympus, a start-up hedge fund with virtually no investment history.

75. Moreover, even after sustaining heavy losses in Olympus, Perlin and Merrill Lynch invested another $500,000.00 in John Henry, which did nothing to diversify Plaintiff's holdings.

76. Additionally, as set forth above, Merrill Lynch also failed to advise Plaintiff that there were numerous options which would have enabled him to diversify the unregistered shares of Cybershop stock in accordance with Plaintiff's clearly stated investment objectives.

77. Merrill Lynch's and Perlin's behavior was completely inappropriate and in breach of the Financial Services Agreement considering Plaintiff's very specific investment objectives and Plaintiff's desire to diversify his assets, and in breach of the Financial Services Agreement.

78. Merrill Lynch's and Perlin's investment strategy together with the representations

made to Plaintiff, were wholly incompatible with the terms of the Financial Services Agreement and clearly contrary to Perlin's and Merrill Lynch's express guarantees and assurances which induced Plaintiff to invest his entire life savings with Merrill Lynch in the first place.

79.  Although the purchase of non-diversified high risk hedge funds should have raised a red flag given Plaintiff's investment objectives, at no time did anyone at Merrill Lynch contact Plaintiff to confirm his investments objectives or to inquire why large sums of money were being wired out of his account.

80.  Merrill Lynch's and Perlin's investment strategy and recommendations left very little of Plaintiff's assets in secure investment vehicles.

81.  As a direct and proximate result of Merrill Lynch's and Perlin's breach of contract, Plaintiff has sustained actual out of pocket losses in Olympus of over $6,000,000.00.

## COUNT III

### RESPONDEANT SUPERIOR

82.  Plaintiff incorporates by reference Paragraphs 1 through 81 above as if the same were set forth fully herein.

83.  Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch. Perlin's acts, conduct and wrongs complained of herein by Plaintiff were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch.

84.　Merrill Lynch is responsible for the damages that Plaintiff suffered as the direct and proximate result of Perlin's acts and/or omissions within the scope of his employment.

WHEREFORE, Plaintiff Ian Phillips respectfully requests that judgment be entered in his favor and against Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated in excess of Six Million ($6,000,000.00) Dollars together with interest, costs, attorney's fees, punitive damages and such other relief as this Court deems just and equitable.

Respectfully submitted,

**FRANK, ROSEN, SNYDER & MOSS, LLP**

By: _____
**MARC H. SNYDER, ESQUIRE**
Supreme Court I.D. No.3791
Frank, Rosen, Snyder & Moss, L.L.P.
1813 Marsh Road, Suite D
Wilmington, DE 19810
(302) 475-8060
Attorney for Plaintiff

Dated: October 21, 2005