# EXHIBIT

# "A"

## NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

In the Matter of the Arbitration Between,    :
:
:
:
:
IAN S. PHILLIPS,    :
:
        Claimant,    :
:
:
        v.    :     NASD Arb. No.
:
:
MERRILL LYNCH, PIERCE, FENNER &amp;  :
SMITH INCORPORATED AND    :
ROUND HILL SECURITIES, INC.,    :
:
:
        Respondents.    :

## STATEMENT OF CLAIM

Claimant, Ian S. Phillips, by and through his undersigned counsel, Frank, Rosen, Snyder &amp; Moss, LLP, hereby brings this claim against respondents Merrill Lynch, Pierce, Fenner &amp; Smith Incorporated and Round Hill Securities, Inc. and in support thereof, sets forth as follows:

## PARTIES

1.    Claimant, Ian S. Phillips ("Claimant") is an adult individual residing at 58 Otter Cove Drive, Old Saybrook, CT 06475.

2.    Respondent Merrill Lynch, Pierce, Fenner &amp; Smith Incorporated ("Merrill Lynch") is a Delaware corporation with a principal place of business located at 4 World Financial Center, New York, NY 10271. At all times relevant hereto, Merrill Lynch conducted business as a

1

broker-dealer and was a member of the National Association of Securities Dealers, Inc. ("NASD").

3.    Respondent Round Hill Securities, Inc. ("Round Hill") is a Delaware corporation with a principal place of business located at 3191 Danville Boulevard, Alamo, CA 94507. At all times relevant hereto, Round Hill conducted business as a broker-dealer and was a member of the NASD.

<u>JURISDICTION</u>

4.    This claim is subject to investor agreements by and between the parties which contain an NASD arbitration clause. Jurisdiction is provided by the investor agreements and pursuant to Rule 10101 and 10301 of the NASD Code of Arbitration Procedure.

<u>SUMMARY OF CLAIM</u>

5.    This case relates to the gross misconduct and reckless mishandling of Claimant's investment accounts by Merrill Lynch, Round Hill and its registered representative Sanford Perlin ("Perlin")[1]. During the time period from 1999 to 2003, Merrill Lynch, Round Hill and Perlin made misrepresentations and material omissions of fact to Claimant, failed to implement an appropriate investment strategy, failed to manage Claimant's accounts in a manner consistent with Claimant's investment objectives, and made unsuitable transactions, which included investing in high-risk hedge funds. These acts and Merrill Lynch and Round Hill's failure to supervise Claimant's

---

[1] Sanford Perlin, CRD No. 360362, is an adult individual who was at all times herein mentioned and herein relevant employed as a registered representative of either Merrill Lynch or Round Hill. Perlin's acts, conduct and wrongs complained of herein by Claimant were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch and/or Round Hill. Perlin's employment with Merrill Lynch was terminated in May of 2000. From May of 2000 to present Perlin has been a registered representative of Round Hill.

accounts and their registered representative Perlin form the basis of Claimant's causes of action for

violations of the statutory and common law of the State of Connecticut, federal securities law, and

multiple NASD Conduct Rules.

## FACTUAL BACKGROUND

6.      Claimant was the founder and 51% shareholder of The Magellan Group, Inc.

("Magellan"), a Connecticut corporation whose primary business activities involved providing

direct marketing services to businesses.

7.      In 1999, Claimant and his partner decided to sell Magellan and entered into an

agreement and plan of merger ("Merger Agreement") with Cybershop International, Inc. and MG

Acquisition Corp., (collectively, "Cybershop") in which Claimant sold his entire interest in

Magellan to Cybershop.

8.      The consideration paid by Cybershop to Claimant for his Magellan stock was

approximately $2,550,000.00 in cash and 510,000 shares of the common stock of Cybershop

("Cybershop Stock").[2]

9.      However, the bulk of the Cybershop Stock was restricted because it was not

registered under the Securities Act of 1933 ("1933 Act"), based upon the "private offering

exemption" under the 1933 Act.[3]

---

[2] As of the date of closing for the Merger Agreement, Cybershop was a publicly traded company listed on the NASDAQ Stock Market and its stock was trading at approximately $10.00 per share. As such, Claimant's Cybershop Stock was valued at approximately $5,100,000.00.

[3] The Merger Agreement did require Cybershop to commence the registration under the 1933 Act on Form S-3 of approximately 75,000 shares of the Cybershop Stock no later than July 1, 1999.

3

10.    Moreover, the unregistered shares were subject to a one-year holding period and the subsequent Rule 144 volume requirements.

11.    Prior to closing on the Merger Agreement, Claimant decided that he needed a professional investment advisor to manage the proceeds from the sale of his business.

12.    Claimant's decision to engage an investment advisor was based on the fact that he did not have significant investment experience and considered himself a novice investor.

13.    Moreover, Claimant had no prior experience in dealing with unregistered shares and never had a significant investment portfolio.

14.    Approximately two months prior to closing, Claimant was introduced to Perlin, who at the time worked out of Merrill Lynch's New York City office, by a mutual friend and arranged an initial consultation with Perlin to discuss his current financial position and to inquire about Merrill Lynch's services as an investment advisor.

15.    In a subsequent meeting in May of 1999, Claimant stated to Perlin that he viewed the cash and stock he was going to receive from the sale of his business as his retirement fund and that he was concerned because the bulk of the Cybershop Stock was unregistered and could not be sold in the open market.

16.    With regard to the Cybershop Stock, Claimant specifically asked Perlin if there was anything he could do to protect the unregistered shares, if the stock price declined.

17.    Perlin advised Claimant that there was no hedging strategy available for unregistered shares and that there was nothing Merrill Lynch could do to liquidate his Cybershop Stock.

18.    At the meeting, Claimant also shared with Perlin his financial objectives, including

4

the fact that he was not interested in speculative investments and would like to diversify his holdings as much as possible.

19.    Claimant also made clear to Perlin that although he was a successful businessman, he had virtually no investment experience and that he would rely on Perlin and Merrill Lynch's recommendations and professional expertise to manage his portfolio.

20.    Perlin assured Claimant that he was capable of managing his assets in a manner consistent with his investment objectives.

21.    Moreover, Perlin held himself out as a high net worth individual and represented to Claimant that he had significant experience representing large accounts and that he could invest Claimant's assets in vehicles which were designed to preserve the proceeds from the sale of his business.

22.    Perlin also stated to Claimant that he normally does not take on an account unless the person has at least 5 to 10 million dollars to invest with Merrill Lynch and that Perlin was making an "exception" to his rule because Claimant was an acquaintance of one of Perlin's friends.

23.    Based solely on Perlin and Merrill Lynch's representations and assurances about Claimant's investment objectives, Claimant engaged Perlin and Merrill Lynch as his financial advisor and opened an investment account in May of 1999.

24.    From that time forward, Claimant relied upon Perlin and Merrill Lynch to provide suitable investment guidance and to make recommendations of investments that were particularly tailored to his needs, and Perlin and Merrill Lynch knew and understood that Claimant was relying thereon.

25.     On or about June 1, 1999, closing occurred on the Merger Agreement.

26.     On June 4, 1999, Claimant transferred approximately $2,786,300.00, which represented the entire cash proceeds from the Merger Agreement, to his Merrill Lynch account.

27.     On June 7, 1999, Claimant delivered to Perlin and Merrill Lynch the Cybershop Stock in the form of original stock certificates Nos. CS 0203 and CS 0204, for 433,500 and 76,500 shares, respectively.[4]

28.     Shortly thereafter, Claimant arranged a meeting with Perlin in his Merrill Lynch office in New York City to discuss how to invest the proceeds from the sale of his business.

29.     At the meeting, Perlin specifically stated to Claimant that it was "easy" to make money in an up market but his goal was to protect Claimant in case the market went "south".

30.     At the time of the meeting, Claimant's Merrill Lynch CMA account had a balance of approximately $3,000,000.00 in cash and the unregistered Cybershop Stock had a market value of approximately $5,000,000.00.

31.     Claimant specifically stated to Perlin at the meeting that the assets in his Merrill Lynch account consisted of the bulk of his life savings.

32.     Moreover, Claimant again raised the issue of the unregistered Cybershop Stock and again inquired about whether or not he could diversify his holdings.

33.     Claimant also told Perlin that he had concerns about Cybershop's stock price

---

[4] Upon information and belief, stock certificate No. CS203 (433,500 shares) represented the unregistered shares and stock certificate No. CS0204 (76,500 shares) represented the shares that had to be registered no later than July 1, 1999.

declining and that Perlin should not rely on the value of the stock when making his investment decisions with the cash holdings.

34.     Perlin again responded by stating that there was nothing he could do to protect Claimant regarding the unregistered Cybershop Stock but that he could invest the cash in a number of investment vehicles that would meet Claimant's investment objectives.

35.     About a week to ten days after the meeting in Merrill Lynch's office, Perlin told Claimant that he knew of a great investment opportunity for Claimant and suggested placing $2,000,000.00 in a limited partnership named Olympus, LLP ("Olympus").

36.     Perlin informed Claimant that Olympus was being managed by himself and his stepson Robert Loud ("Loud").[5]

37.     Perlin also told Claimant that his whole family was invested in Olympus, which included various family trusts, and that Olympus was a suitable investment given Claimant's investment objectives.[6]

38.     Thereafter, Perlin invited Claimant back to the Merrill Lynch office and conducted multiple phone conferences with Loud in which he demonstrated the type of analysis that went into the decision making process for Olympus' investments.

39.     Perlin again told Claimant that he thought a suitable investment in Olympus would be $2,000,000.00, which at the time represented in excess of 66% of Claimant's liquid assets.

---

[5] Robert N. Loud, CRD No. 1376572, was at the time employed by Schild Asset Management, Inc. On or about May 9, 2000, Loud became a registered representative of Round Hill and joined Perlin in Round Hill's Connecticut office.

[6] Subsequently, Claimant discovered that the Perlin family trust only invested approximately $500,000.00.

40.     Having no reason to doubt Perlin or Merrill Lynch, Claimant agreed to invest in Olympus and on June 29, 1999, Perlin wired $2,000,000.00 from the Merrill Lynch CMA account to the Olympus account.

41.     At the time of the investment, Perlin and Merrill Lynch provided Claimant virtually no information regarding Olympus.

42.     In fact, upon information and belief, Perlin and Merrill Lynch did not even provide Claimant a prospectus or other written disclosure documents for the Olympus investment.

43.     Over the course of the next several months, Perlin would call Claimant on numerous occasions and tell him how well the fund was doing.

44.     During these conversations, Perlin often told Claimant that he was managing the portfolio of several "high level executives" at Merrill Lynch, including a CEO of a Fortune 100 company.

45.     On September 30, 1999, Claimant received a report from Olympus, which stated that his account had lost $342,000.00.

46.     Claimant immediately phoned Perlin at Merrill Lynch and inquired about the loss.

47.     Perlin explained to Claimant that the fund was doing well and that the losses were simply a result of "shifting" market conditions.

48.     In November and December of 1999, Claimant again received phone calls from

8

Perlin stating that things were going "great" with the Olympus investment.[7]

49.    In February of 2000, Perlin invited Claimant and his wife to dinner.

50.    At the dinner, Claimant inquired as to why he had not received a year-end statement that reflected his Olympus investment.

51.    Perlin responded that he should have a "draft" of the report shortly and gave Claimant with a piece of paper titled" Olympus Domestic Return Date Since 6/30/99", which showed a cumulative return of 22% for Claimant's investment since June 1999.

52.    However, in March of 2000, Claimant received a K-1 from the Olympus accountant, which reflected Claimant's investment was valued at $1,440,846.00 and that Claimant's investment accounted for 22% of the partnership.

53.    Claimant immediately called Perlin at Merrill Lynch to inquire about the K-1 and asked how it was possible that he lost money since Perlin told him the previous month that Claimant's investment had a cumulative rate of return of 22%.

54.    Perlin replied by stating that there was no way Claimant lost in excess of $500,000.00 and that there must have been an "accounting" error.

55.    Shortly thereafter, Perlin provided Claimant with a quarterly report indicating that the fund was up substantially for the quarter.

56.    After receiving numerous calls from Perlin in which he touted Olympus'

---

[7] During this time, a portion of Claimant's Cybershop Stock was registered pursuant to the Merger Agreement and Claimant instructed Perlin to liquidate approximately 40,000 shares of his Cybershop Stock held in his Merrill Lynch account.

performance and Merrill Lynch's ability to manage high net worth individuals, Claimant again felt comfortable with the status of his investments with Perlin and Merrill Lynch.

57.    In March of 2000, Perlin advised Claimant that he knew of another great investment opportunity and instructed Claimant to invest $500,000.00 in a commodities fund.

58.    Trusting Perlin's and Merrill Lynch's judgment, Claimant agreed to the investment in the fund and Perlin wired $500,000.00 from Claimant's Merrill Lynch CMA account to a commodities fund run by John Henry & Company, Inc. ("John Henry").

59.    Once again, Perlin and Merrill Lynch provided little information to Claimant about the investment and failed to disclose the inherent risks associated with commodities funds.

60.    On May 10, 2000, Perlin informed Claimant that he had left Merrill Lynch and was now working for a new brokerage firm named Round Hill.

61.    Perlin stated to Claimant that Round Hill was a strong investment house and that he would receive the same level of service as he had at Merrill Lynch.

62.    Furthermore, Perlin told Claimant that he was going to be managing a fund at Round Hill named Kleos Capital Partners, L.P. ("Kleos") and that the fund would be a good fit for Claimant's investment portfolio.[8]

63.    Feeling comfortable with Perlin, Claimant transferred the funds in his Merrill Lynch account to Round Hill.

_____

[8] The Kleos brokerage accounts were maintained by Round Hill and trades were cleared by Bear Stearns Securities Corp. As such, Round Hill had detailed information for each and every transaction in the Kleos account, including trades, deposits and withdraws.

64.    By August of 2000, Claimant's John Henry investment had declined approximately $125,000.00 and was valued at $375,000.00.

65.    Around this time, Perlin told Claimant that the Kleos fund was up and running and instructed Claimant to liquidate the balance of the John Henry investment and invest $500,000.00 in Kleos.

66.    Claimant, still under the impression that the Olympus fund was prospering and that Perlin was looking after his best interests, agreed to the $500,000.00 investment in Kleos.[9]

67.    However, the $500,000.00 investment in Kleos quickly declined and by December 2000, Claimant had lost 18% of his investment.

68.    Over the course of the next year, Claimant became increasingly suspicious of Perlin's activities and began to question Perlin's investment decisions made by Perlin, Merrill Lynch and Round Hill.

69.    Moreover, Claimant's unregistered Cybershop Stock became virtually worthless when Cybershop's stock plummeted during the time period the shares were restricted.

70.    In August of 2001, Claimant liquidated 90% of his Olympus holdings.

71.    For much of 2002, Perlin continued to state to Claimant that the Kleos investment was going to recover and urged Claimant to maintain his positions at Round Hill.

72.    However, despite Perlin's representations, the Kleos fund never recovered and

---

[9] Claimant funded the $500,000.00 investment with the $375,000.00 he received when he liquidated his John Henry investment and an additional $125,000.00 in cash, which was held in his Round Hill account.

11

Claimant liquidated his holdings in Kleos for approximately $250,000.00

### Merrill Lynch Investments

73.     The investment decisions made by Merrill Lynch and Perlin, as set forth above, were patently unsuitable given Claimant's age, employment status, net worth and investment objectives.

74.     In 1999, after working his whole life in various businesses, Claimant was presented with a once in a lifetime opportunity to sell his business and achieve financial independence.

75.     Claimant, a novice investor, realized that he needed professional help to manage the proceeds from the sale and entrusted Merrill Lynch with his life savings.

76.     Claimant trust of Merrill Lynch and Perlin was based on Merrill Lynch's reputation and Merrill Lynch and Perlin's repeated representations and assurances that they were capable of providing Claimant comprehensive financial services and professional assistance in managing Claimant's assets.

77.     However, once Merrill Lynch and Perlin gained control of Claimant's assets, they engaged in a radical course of conduct, which included investing a staggering $2,000,000.00 in Olympus, a start-up hedge fund with virtually no investment history.

78.     Even after sustaining heavy losses in Olympus, Perlin and Merrill Lynch invested another $500,000.00 in John Henry, which did nothing to diversify Claimant's holdings.

79.     In fact, the John Henry investment, which focused on commodities, was inherently speculative, exposing Claimant to a significant degree of risk.

80.      Merrill Lynch and Perlin's behavior was completely inappropriate considering Claimant's very specific investment objectives and Claimant's desire to diversify his assets.

81.     Perlin and Merrill Lynch had no reason to believe that any portion of the Claimant's retirement savings was intended for speculation, or that Claimant was desirous of or suitable for the type of high-risk non-diversified investments purchased by Perlin and Merrill Lynch.

82.     Upon information and belief, Perlin and Merrill Lynch intentionally misled Claimant and induced him into investing in speculative securities by failing to provide prospectuses for investments, failing to inform Claimant about critical details of the investments, and classifying high risk investments as suitable for Claimant.

83.     Moreover, Merrill Lynch and Perlin's investment strategy, and the representations they made to Claimant, were wholly incompatible and were certainly contrary to Perlin's and Merrill Lynch's express guarantees and assurances, which induced Claimant to invest his entire life savings with Merrill Lynch in the first place.

84.     Furthermore, even though the purchase of non-diversified high risk hedge funds should have raised a red flag given Claimant's investment objectives, at no time did anyone at Merrill Lynch contact Claimant to confirm his investments objectives or to inquire why large sums of money was being wired out of his account.

85.     Perlin and Merrill Lynch's investment strategy left very little of Claimant's assets in more secure investment vehicles, such as Fortune 500-type equities, secured bond funds, CDs, or money market accounts.

86.     In addition to investing in patently unsuitable investment vehicles, Merrill Lynch and Perlin also provided inaccurate information with regard to Claimant's unregistered Cybershop Stock.

13

87.    Specifically, Merrill Lynch failed to advise Claimant that there were options to diversify the unregistered shares of Cybershop Stock via pre-paid variable forwards ("PPVF") and private sales ("Private Sales").

88.    Both PPVF and Private Sales allow individuals who own unregistered shares, which are subject to a one-year holding period and the Rule 144 requirements, to reduce their exposure and achieve diversification.

89.    Had Merrill Lynch and Perlin advised Claimant that a hedging strategy was available, Claimant certainly would have done everything in his power to diversify his holdings and would not have been exposed to degree of risk that he was.

90.    However, Claimant did nothing based on Perlin and Merrill Lynch's advice and Claimant's unregistered shares of the Cybershop Stock became virtually worthless when Cybershop's price crashed during the time period the shares were restricted.

91.    Due to Merrill Lynch and Perlin's conduct, Claimant has sustained actual out of pocket losses in Olympus of over $800,000.00 and actual out of pocket losses in John Henry of over $100,000.00.

92.    Moreover, based on Merrill Lynch and Perlin's negligent advice, Claimant lost the opportunity to liquidate his unregistered Cybershop Stock, which at one point was valued at over $5,000,000.00.

14

## Round Hill Investments

93.    Once Perlin left Merrill Lynch and joined Round Hill in 2000, Perlin continued his ill-advised investment strategy.

94.    Within three months of Claimant transferring his assets to Round Hill, Perlin had convinced Claimant to invest $500,000.00 in Kleos, another start-up hedge fund which was run by Loud.

95.    Much like Olympus, the Kleos investment was patently unsuitable for Claimant, given his financial condition and investment objectives.

96.    Additionally, Perlin and Round Hill failed to disclose significant facts to Claimant regarding the fund's management structure and commission fees.

97.    Upon information and belief, Round Hill (as the executing broker for Kleos) and Loud (as the sole executive officer and member of Kleos) received significant commission fees for each and every transaction conducted by Kleos.

98.    At no time did Round Hill alert Claimant to the inherent conflict of interest between Round Hill, Perlin and Loud.

99.    In fact, upon information and belief, Perlin, Loud, and Round Hill concealed many details about Claimant's investments in Kleos, which would have alerted Claimant to the inherent risks associated with the investment.

100.    Upon information and belief, the Kleos fund was grossly mismanaged and in fact served as a personal piggy bank to Loud and Perlin.

101.    Upon information and belief, Loud and Perlin wrote Kleos issued checks to cover

15

personal expenses, not authorized under the Kleos partnership agreement.

102.   Furthermore, even though Round Hill had access to every transaction in the Kleos account, at no time did any supervisor or manager at Round Hill notice the red flag activities in the Kleos account or contact Claimant to confirm his investments objectives,

103.   Despite Perlin's continued representations during this time period that the accounts were diversified and invested in accordance with Claimant's objectives, Perlin and Round Hill's management of the accounts was flawed in that the emphasis in non-diversified funds exposed Claimant to significant risk.

104.   Due to Round Hill and Perlin's conduct, Claimant has sustained actual out of pocket losses in excess Kleos in excess of $300,000.00.

**COUNT I**

**VIOLATION OF SECTION**
**10(b) OF THE SECURITIES EXCHANGE ACT OF 1934**
**AND RULE 10b-5 PROMULGATED THEREUNDER**
(Against All Respondents)

105.   Claimant incorporates by reference Paragraphs 1 through 104 above as if the same were set forth fully herein.

106.   Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch and/or Round Hill. Perlin's acts, conduct and wrongs complained of herein by Claimant were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch and/or Round Hill.

16

107.   At all times herein mentioned and herein relevant Merrill Lynch, Round Hill and Perlin had promised comprehensive financial services and professional assistance in managing Claimant's assets.

108.   The wrongful conduct of Merrill Lynch, Round Hill and Perlin and their conscious disregard of explicit investment objectives, misrepresentations and other acts complained of herein, constitute a scheme or course of conduct which operated as a fraud and deceit upon Claimant.

109.   The warranties and representations of Merrill Lynch, Round Hill and Perlin were false when made, and the manner in which the account was handled was reckless or grossly negligent in that, among other things, Merrill Lynch and Perlin knew or should have known that their actions were inconsistent with Claimant's express investment objectives, were in contravention of Claimant's best interests, contrary to industry standards, and directly in violation of industry rules and regulations.

110.   Claimant justifiably relied on Merrill Lynch, Round Hill and Perlin to give proper advice and guidance, to make suitable recommendations, and to manage his account in a professional and prudent manner.

111.   Claimant also justifiably relied on the honesty and integrity of Merrill Lynch, Round Hill and Perlin and the processes and procedures supposedly used and followed by Perlin.

112.   As set forth above, Merrill Lynch and Perlin clearly misled Claimant by, inter alia, failing to implement an appropriate hedging strategy, leaving Claimant in the dark about the extreme risks associated with Olympus and Kleos, classifying high risk investments as suitable for Claimant, failing to advise Claimant about the market volatility in his accounts, and failing to

17

present Claimant with alternative investment options.

113.   As a direct result of the conduct of Merrill Lynch, Round Hill and Perlin, Claimant has suffered damages.

114.   By reasons of the acts, omissions, practices, and course of business set forth herein, Merrill Lynch, Round Hill and Perlin have violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

## COUNT II

## VIOLATIONS OF THE NASD AND NYSE SUITABILITY RULES
### (Against All Respondents)

115.   Claimant incorporates by reference Paragraphs 1 through 114 above as if the same were set forth fully herein.

116.   Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch and/or Round Hill. Perlin's acts, conduct and wrongs complained of herein by Claimant were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch and/or Round Hill.

117.   Merrill Lynch, Round Hill and Perlin, as members of the NASD, are obligated to conduct themselves and their business in accordance with industry standards and the rules and regulations of industry's self-regulatory organizations.

118.   As such, Merrill Lynch, Round Hill and Perlin are held, at a minimum, to the standards of the industry as evidenced by the rules of the Securities and Exchange Commission, the

18

NASD, and the New York Stock Exchange.

119.    Claimant was entitled to assume that the performance of the adviser in giving investment advice and financial counseling would conform to the basic norms and standards of the industry.

120.    Rule NYSE 405(1) and NASD Rule 2310(a) are the "know your customer" and "suitability" rules for the NASD and NYSE.

121.    The "know your customer" and "suitability" rules charge a broker with the affirmative obligation to seek out information about his or her customer's financial status and investment objectives, in order to match this background with an appropriate investment strategy.

122.    A broker may not recommend an investment strategy that would be inappropriate in light of the particular financial circumstances, background, needs and objectives of the customer.

123.    As set forth above, Merrill Lynch, Round Hill and Perlin engaged in exactly this prohibited conduct through their unsuitable recommendations of securities and their total disregard for Claimant's investment needs and objectives.

124.    If Merrill Lynch, Round Hill and Perlin had adhered to the "know your customer" and "suitability" rules and had actually considered Claimant's needs and objectives, Claimant would have never invested in Olympus, John Henry or Kleos and his life savings would have never been exposed to the high degree of risk that it was.

125.    As a direct and proximate result of Merrill Lynch, Round Hill and Perlin's failure to comply with the NASD and NYSE rules and regulations, Claimant has suffered damages.

## COUNT III

## VIOLATIONS OF THE CONNECTICUT UNIFORM SECURITIES ACT (CUSA)
### (Against All Respondents)

126.    Claimant incorporates by reference Paragraphs 1 through 125 above as if the same were set forth fully herein.

127.    Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch and/or Round Hill. Perlin's acts, conduct and wrongs complained of herein by Claimant were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch and/or Round Hill.

128.    Connecticut Uniform Securities Act (CUSA), Conn. Gen. Stat. § 36-470, specifically § 36-498 reads, in pertinent part,

(a) Any person who: . . .(1) Offers or sells or (2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission...is liable to the person buying the security from him...

(b) Every person who directly or indirectly controls a seller liable under subsection (a) . . . in the sale and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller...

129.    The anti-fraud provisions of the CUSA explicitly provide a customer with a private right of action to redress statutory violations.

130.    As set forth above, Merrill Lynch, Round Hill and Perlin knowingly and/or

20

recklessly made numerous material misrepresentations and omissions of material facts, which

induced Claimant to invest in patently unsuitable securities.

131.    Claimant did not know that the misrepresentations made by Merrill Lynch, Round

Hill and Perlin were false, nor was he aware that certain material facts were intentionally omitted

by Merrill Lynch, Round Hill and Perlin with regard to the investments maintained in his account.

132.    As a direct and proximate result of Merrill Lynch, Round Hill and Perlin's conduct,

Claimant has suffered damages.

**COUNT IV**

**BREACH OF FIDUCIARY DUTY**
**(Against All Respondents)**

133.    Claimant incorporates by reference paragraphs 1 through 132 above as though the

same were fully set forth herein.

134.    Perlin was at all times herein mentioned and herein relevant employed as a

registered representative of Merrill Lynch and/or Round Hill.  Perlin's acts, conduct and wrongs

complained of herein by Claimant were carried out within the course and scope of Perlin's

employment with the express, apparent and/or implied authority of Merrill Lynch and/or Round

Hill.

135.    Merrill Lynch, Round Hill and Perlin have a duty of absolute trust and loyalty to

Claimant, among other things, to provide financial consulting services consistent with Claimant's

investment objectives and express desires and to abide by Claimant's explicit instructions with

respect to investments in his account.

21

136.    Merrill Lynch, Round Hill and Perlin owed Claimant a fiduciary duty of full disclosure, honesty and complete candor in their dealings with Claimant and had a duty to make full disclosure of all material facts necessary for Claimant to make informed investment decisions, and to recommend and engage only in strategies consistent with the Claimant's investment objectives.

137.    Claimant placed his trust in Merrill Lynch, Round Hill and Perlin based upon the special fiduciary relationship that was created between Claimant, Merrill Lynch and Perlin.

138.    Merrill Lynch, Round Hill and Perlin have conducted themselves towards Claimant in a willful, reckless and malicious manner by undertaking to deceive and harm Claimant by misrepresentation and conduct that placed Claimant's accounts at extraordinary risk, which was known or should have been know to Merrill Lynch, Round Hill and Perlin.

139.    Merrill Lynch, Round Hill and Perlin breached the fiduciary duties they owed to Claimant by, inter alia, not recommending conservative, safe and suitable investments in light of Claimant's investment objectives and financial condition, failing to perform the requisite due diligence with regard to Claimant's investments, and making misrepresentations and omissions regarding Claimants' accounts including key components regarding the Olympus, John Henry and Kleos investments.

140.    As a direct and proximate result of Merrill Lynch, Round Hill and Perlin's breach of their fiduciary duties, Claimant has suffered damages.

## COUNT V

### FAILURE TO SUPERVISE & CONTROL PERSON LIABILITY
### (Against All Respondents)

141.    Claimant incorporates by reference Paragraphs 1 through 140 above as if the same were set forth fully herein.

142.    Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch and/or Round Hill. Perlin's acts, conduct and wrongs complained of herein by Claimant were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch and/or Round Hill.

143.    Furthermore, Perlin was a "controlled" person within the meaning of Section 20(a) of the Securities Exchange Act of 1934 and was at all times herein mentioned and herein relevant controlled by Merrill Lynch and/or Round Hill.

144.    Merrill Lynch and Round Hill failed to supervise or monitor Perlin in a reasonable and diligent manner.

145.    Merrill Lynch and Round Hill's conduct included: failing to learn the essential facts concerning Claimant's account, failing to monitor the transactions carried out in Claimant's accounts, failing to supervise the activities of Perlin and failing to establish, maintain and/or enforce procedures which would have prevented the violative conduct complained of herein.

146.    In addition, to the extent that Merrill Lynch and Round Hill had implemented a supervisory system, Merrill Lynch and Round Hill's supervisory system was inadequate in that it

failed to prevent the conduct of Perlin and the resulting harm to Claimant as set forth herein.

147.    As a direct and proximate result of Merrill Lynch and Round Hill's failure to supervise, Claimant has suffered damages.

## COUNT VI

### BREACH OF CONTRACT AND THE COVENANT OF GOOD FAITH AND FAIR DEALING
#### (Against All Respondents)

148.    Claimant incorporates by reference Paragraphs 1 through 147 above as if the same were set forth fully herein.

149.    Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch and/or Round Hill. Perlin's acts, conduct and wrongs complained of herein by Claimant were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch and/or Round Hill.

150.    As set forth above, Merrill Lynch, Round Hill and Perlin entered into an investor agreement pursuant to which Claimant engaged Merrill Lynch, Round Hill and Perlin to provide investment related services to Claimant.

151.    Additionally, in soliciting Claimant's assets, and throughout their relationship, Merrill Lynch, Round Hill and Perlin often promised to provide comprehensive financial services and professional asset management and financial advice.

152.    Pursuant to their representations and investor agreements, Merrill Lynch, Round Hill and Perlin agreed to invest the Claimant's funds prudently and consistent with his investment

24

objectives.

153. The implied covenant of good faith and fair dealing that is read into every contract required Merrill Lynch and Perlin to treat Claimant honestly and to act in his best interests in providing such services and advice.

154. Merrill Lynch, Round Hill and Perlin breached the contract with Claimant by, <u>inter alia</u>, not recommending conservative, safe and suitable investments in light of Claimant's investment objectives and employment status, failing to perform the requisite due diligence with regard to their investment decisions, and making misrepresentations and omissions regarding Claimant's account.

155. As a direct and proximate result of Merrill Lynch, Round Hill and Perlin's breach of contract, Claimant has suffered damages.

**COUNT VII**

**<u>RESPONDEANT SUPERIOR</u>**
**(Against All Respondents)**

156. Claimant incorporates by reference Paragraphs 1 through 155 above as if the same were set forth fully herein.

157. Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch and/or Round Hill. Perlin's acts, conduct and wrongs complained of herein by Claimant were carried out within the course and scope of Perlin's employment with the express, apparent and/or implied authority of Merrill Lynch and/or Round

25

Hill.

158.    As such, Merrill Lynch and Round Hill are responsible for the action of Perlin because his action as alleged herein were within the scope of his employment.

159.    As a direct and proximate result of Merrill Lynch, Round Hill and Perlin's conduct, Claimant has suffered damages.

### COUNT VIII

### COMMON LAW FRAUD
**(Against All Respondents)**

160.    Claimant incorporates by reference Paragraphs 1 through 159 above as if the same were set forth fully herein.

161.    Perlin was at all times herein mentioned and herein relevant employed as a registered representative of Merrill Lynch and/or Round Hill.  Perlin's acts, conduct and wrongs complained of herein by Claimant were carried out within the course and scope of Perlin's employment.

162.    In an action for common law fraud a respondent must have concealed or made a false representation of a material fact, which was reasonably calculated to deceive the claimant.

163.    Furthermore, the claimant must have acted in reliance on respondent's false representation to his detriment.

164.    A respondent's intent to defraud may be inferred from the specific facts surrounding the alleged claim and no direct evidence of fraudulent intent is required.

165.    As set forth above, Merrill Lynch, Round Hill and Perlin knowingly and/or

26

recklessly made multiple misrepresentations of material facts concerning the nature of Claimant's investment accounts.

166.    Claimant clearly relied on the aforesaid misrepresentations throughout his relationship, believing that Merrill Lynch, Round Hill and Perlin were acting in his best interest and that Merrill Lynch, Round Hill and Perlin knew how to best manage his assets.

167.    However, completely unbeknownst to Claimant, Merrill Lynch, Round Hill and Perlin's advice was not in his best interest, and in fact, was contrary to their own express representations.

168.    As a direct and proximate result of Merrill Lynch, Round Hill and Perlin's material misrepresentations and material omissions of fact, Claimant has suffered damages.

**COUNT IX**

**PROFESSIONAL NEGLIGENCE**
**(Against All Respondents)**

169.    Claimant incorporates by reference Paragraphs 1 through 168 above as if the same were set forth fully herein.

170.    Merrill Lynch, Round Hill and Perlin owed Claimant a duty of care that required them to act in accordance with industry standards and regulations.

171.    Merrill Lynch, Round Hill and Perlin were professionally negligent based on allegations set forth above which included: failing to learn the essential facts concerning Claimant's account; failing to monitor the transactions carried out in Claimant's accounts; failing to supervise the activities of Perlin and failing to establish, maintain and/or enforce procedures which would

27

have prevented the violative conduct complained of herein.

172.    As a direct and proximate result of Merrill Lynch, Round Hill and Perlin's

professional negligence, Claimant has suffered damages.

**WHEREFORE,** Claimant Ian S. Phillips requests damages and recovery against

respondents Merrill, Lynch, Pierce, Fenner & Smith Incorporated and Round Hill Securities, Inc.

as follows:

(a) An award against respondent Merrill Lynch for the damages sustained by Claimant, including, but not limited to, an amount in excess of $900,000.00, representing the actual out of pocket loss in Claimant's investments managed by Merrill Lynch;

(b) An award against respondent Merrill Lynch for the damages sustained by Claimant, including but not limited to, an amount in excess of $5,000,000.00, representing the value of the Cybershop Stock at the time Merrill Lynch failed to initiate an appropriate hedging strategy;

(c) An award against respondent Round Hill for the damages sustained by Claimant, including, but not limited to, an amount in excess of $300,000.00, representing the actual out of pocket loss in Claimant's investments managed by Round Hill;

(d)    Interest at the legal rate on all sums recovered;

(e)    The cost of this proceeding, including reasonable attorney fees;

(f)    An award of punitive damages in the amount of $1,000,000.00 for Merrill Lynch and Round Hill's unlawful, willful, wanton and outrageous conduct; and

(g)    An award of such other relief as the Arbitrators deem just and proper.

Respectfully submitted,

By:    /s/ Alan L. Frank
       ALAN L. FRANK, ESQUIRE
       8380 Old York Road, Ste. 410
       Elkins Park, PA 19027
       (215) 935-1000
       Attorneys for Claimant

Dated: January 19, 2005

29